## UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **ANTOINNETTE E. WILSON,** | ) | |
| | ) | |
| **PLAINTIFF,** | ) | |
| | ) | |
| **vs.** | ) | **CASE NO. 08-CV-150-FHM** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **DEFENDANT.** | ) | |

### OPINION AND ORDER

Plaintiff, Antoinnette E. Wilson, seeks judicial review of a decision of the Commissioner of the Social Security Administration denying Social Security disability benefits.[1]  In accordance with 28 U.S.C. § 636(c)(1) & (3) the parties have consented to proceed before a United States Magistrate Judge.

The role of the Court in reviewing the decision of the Commissioner under 42 U.S.C. §405(g) is limited to determining whether the decision is supported by substantial evidence and whether the decision contains a sufficient basis to determine that the Commissioner has applied the correct legal standards. *Grogan v. Barnhart*, 399 F.3d 1257, 1261 (10th Cir. 2005).  Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. *Doyal v. Barnhart*, 331 F.3d 758 (10th Cir.

---

[1]  Plaintiff's November 29, 2004 applications for Disability Insurance and Supplemental Security Income benefits were denied initially and upon reconsideration.  A hearing before an Administrative Law Judge (ALJ) was held August 9, 2007.  By decision dated October 5, 2007, the ALJ entered the findings which are the subject of this appeal.  The Appeals Council denied review of the findings of the ALJ on January 17, 2008.  The action of the Appeals Council represents the Commissioner's final decision for purposes of further appeal. 20 C.F.R. §§ 404.981, 416.1481.

2003).  The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. *See Hackett v. Barnhart*, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. *White v. Barnhart*, 287 F.3d 903, 908 (10th Cir. 2002).

Plaintiff was 46 years old at the time of the hearing. [R. 326].  She claims to have been unable to work since January 3, 2004, due to sarcoidosis, anemia, peripheral neuropathy and depression. [Plaintiff's Brief, Dkt. 16, p. 1].  The ALJ determined that Plaintiff has severe impairments consisting of peripheral neuropathy, anemia and high blood pressure [R. 14], but that she retains the residual functional capacity (RFC) to: lift, carry, push or pull 10 pounds occasionally, less than 10 pounds frequently; that she can stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. [R. 15].  Based upon the testimony of a vocational expert (VE), the ALJ concluded that Plaintiff could perform her past relevant work as a telemarketer. [R. 18].  Alternatively, the ALJ found there are other jobs available in the economy in significant numbers that Plaintiff could perform with that RFC. [R.19-20].  He concluded, therefore, that Plaintiff is not disabled as defined by the Social Security Act. [R. 20].  The case was thus decided at step four, with an alternative finding at step five of the five-step evaluative sequence for determining whether a claimant is disabled. 20 C.F.R. § 416.920; *see Fischer-Ross v. Barnhart*, 431 F.3d 729, 731 (10th Cir. 2005) (describing the five steps); *Williams v. Bowen*, 844 F.2d 748, 750-52 (10th Cir. 1988) (discussing five steps in detail).

Plaintiff asserts the following allegations of error:  1) the ALJ failed to properly evaluate the severity of Plaintiff's depression at step two of the sequential evaluation process because he did not apply the special technique for evaluation of mental impairments as required and inconsistently considered her hypertension, which permitted him to propound an improper hypothetical to the VE that impacted on his decision at steps four and five; 2) the ALJ failed to perform a proper evaluation at step three of the sequential evaluation process because he did not discuss the evidence or even name a single Listing that he had considered and rejected; and 3) the ALJ failed to perform a proper credibility determination because he omitted and misconstrued some of the medical evidence, failed to determine any reason for not following prescribed therapy and failed to consider some of the Luna factors that he should have considered.  For the reasons discussed below, the Court affirms the decision of the Commissioner.

## Medical Record

Plaintiff has a history of sarcoidosis,[2] appearing at age 17 with no recent flareups, and of heroin addiction. [R. 135, 188, 233, 237, 260].  Plaintiff underwent a hysterectomy in 2004 and afterward began complaining of pain, tingling, numbness and hypersensitivity in her feet. [R. 191-198, 208-223, 260-265].  She was diagnosed with peripheral neuropathy (nerve malfunction) on November 10, 2004, by Harvey A. Drapkin, D.O., a physician at the OSU Health Care Center (OSU). [R. 135-137, 260].

---

[2] Sarcoidosis is a disease of unknown cause in which inflammation occurs in the lymph nodes, lungs, liver, eyes, skin or other tissues. *See* medical encyclopedia online: http://www.nlm.nih.gov/med lineplus/ency/article/000076.htm (last updated 29 January 2009).

In December 2004, she was started on Neurontin, a medication designed to control minor seizures and post-shingles symptoms,[3] and amitryptyline (Elavil), an anti-depressant with sedative effects[4] by Dr. Mertz at the OSU clinic. [R. 258].   After acknowledging on December 29, 2004, that she had increased the dosage of Neurontin "by herself" with no improvement noted, Plaintiff was seen for a neurological evaluation and referred for physical therapy. [R. 253, 256].   On January 24, 2005, health care providers at the OSU clinic noted Plaintiff's continuing complaints of staggering gait, tingling and numbness in her feet despite increased dosage of Neurontin. *Id.*   The Neurontin was stopped and Tegretol[5] was started. [R. 254].  Three days later, Tegretol was discontinued because of side effects and Plaintiff's dosage of Elavil was increased. [R. 251-252].

Physical therapy records from Tulsa Regional Medical Center's Rehabilitation Medicine Department from February 8, 2005 through April 19, 2005, reflect some improvement in balance and gait on the treadmill but continued ataxic or antalgic gait and complaints of leg and foot pain, tingling and numbness. [R. 162 - 171].

On April 8, 2005, Plaintiff reported to her treating physician that physical therapy helped with balance but she still experienced "pins and needles" in both feet. [R. 246-

---

[3]  *See* Physicians' Desk Reference (PDR) 53rd ed. (1999) 2301.

[4]  *See* PDR 51st ed. (1997) 2945.

[5]  Tegretol (Carbamazepine) is an anticonvulsant and is used alone or in combination with other medications to treat certain types of seizures in patients with epilepsy.  It is also used to treat trigeminal neuralgia (a condition that causes facial nerve pain), and sometimes used to treat mental illnesses, depression, posttraumatic stress disorder, drug and alcohol withdrawal, restless legs syndrome, diabetes insipidus and certain pain syndromes. *See* drug information online: http://www.nlm.hih.gov /medlineplus/druginfo/meds/a682237.html (last revised 06/01/2008; last reviewed 09/01/2008).

247].   Plaintiff advised she had: "stopped taking her Neurontin because she saw a commercial on TV that said it increases risk of suicide.  Instead, she took a couple of her friend's Lortab, and claims that took away her pain."[6] [R. 246].  Plaintiff was told to continue Neurontin. *Id.*  She was also prescribed a course of Prednisone to determine if her peripheral neuropathy was related to Sarcoidosis.[7] *Id.*  Two weeks later, Plaintiff continued to complain of numbness and tingling in both legs. [R. 244-245].  She was told to taper the Prednisone and was prescribed Lortab 5 mg., BID (twice per day) #40 with no refills and Cymbalta[8]  and was referred to Dr. Sashi Husiam, a neurologist. *Id.*

Plaintiff was examined by Steven Y.M. Lee, M.D., an internist, on April 25, 2005. [R. 140-145].  Dr. Lee summed up Plaintiff's chief complaints as: 1) "Unable to sit all day long or go up and down steps" and 2) "She falls a lot because of poor balance." [R. 140].  Plaintiff reported she "has sarcoidosis affecting her eyes that has been treated with steroid eye drops for many years."  She claimed to have shortness of breath but the cardiovascular exam was negative.  She said the sarcoidosis "is attacking her legs and feet now."  She claimed her legs and feet "give out;" that sometimes her right leg would not move; and when she gets out of bed, her ankles and feet are tightly swollen,

---

[6] Lortab (hydrocodone bitartrate and acetaminophen) is a semisynthetic narcotic analgesic and antititussive indicated for relief of moderate to moderately severe pain. *Physicians' Desk Reference* (PDR) 53rd ed. 3162.

[7] Prednisone is a corticosteroid hormone (glucocorticoid). It decreases the immune system's response to various diseases to reduce symptoms such as swelling and allergic-type reactions. It is used to treat conditions such as arthritis, blood disorders, breathing problems, certain cancers, eye problems, immune system diseases, and skin diseases. See drug information online at: http://fdb.rxlist.com/drugs/drug-1787-Detasone.

[8] Cymbalta is used to treat major depression and also used to relieve nerve pain (peripheral neuropathy) in diabetics. See drug information online at: http://www.medicinenet.com/duloxetine-oral/article.htm

although they were not as swollen on the day of the exam because she had spent all the previous day lying down. *Id.* Upon physical examination Dr. Lee found no swelling or tenderness of the legs, ankles or joints. *Id.* He assessed normal head, ears, eyes, nose and throat, neck, cardiac, pulmonary and abdominal findings. Examination of the central nervous system yielded negative results. *Id.* Range of motion tests of Plaintiff's spine and extremities were all normal and negative with the exception of slight reduction in knee flexion with no pain noted. [R. 142-145]. Plaintiff was able to effectively oppose the thumb, manipulate small objects and grasp tools. [R. 144]. Dr. Lee said: "The most significant finding was a positive Romberg sign.[9] Babinski sign was absent. Deep tendon reflexes were 2+, equal and normal. Straight-leg raising was negative. Heel walking and toe walking were normal. She could walk without an assistive device. Her gait in terms of speed, stability, and safety was within normal limits. As she left the examination room, she appeared to limp. She seemed to walk normally as she approached her car." [R. 141].

On May 10, 2005, Plaintiff reported to the OSU clinic that she was tapering Prednisone and had decreased swelling in her legs. [R. 241-242]. She requested refills of Neurontin, Prednisone and Lortab. *Id.* She was told to continue Prednisone for at least a month before reducing, was given 90 Lortabs, 7.5 mg, and was told that supply "must last 30 days." *Id.*

---

[9] Romberg's sign is a diagnostic sign consisting of a swaying of the body when the feet are placed close together and the eyes are closed. See Medical Dictionary online at: http://www2.merriam-webster.com/cgi-bin/mwmednlm?book=Medical&va=Romberg

A type-written letter with no letterhead was signed by Stan Sherman, D.O., on May 27, 2005, as follows:

> Ms. Wilson has peripheral neurophathy (sic) which may make it hard for her to stand, walk, and carry objects.

[R. 148].

Emergency room records from Tulsa Regional Medical Center (TRMC) show Plaintiff fractured her right great toe on July 13, 2005. [R. 156-160].  She was fitted with a boot and referred to the orthopedic clinic. *Id.*   On July 27, 2005, Plaintiff reported to the OSU clinic that she had been seen at OSU Orthopedic for a right foot fracture. [R. 239-240].  She advised she had been taking Lortab 10 mg. TID (three times a day) and that Neurontin controlled her pain. *Id.*  She was given Panlor (an analgesic) and her Neurontin was refilled. *Id.*  She was advised to follow-up with the orthopedist.

Plaintiff complained of foot pain to Michelle O'Meara, D.O., at the OSU clinic and Lortab 7.5 mg was refilled on August 29, 2005. [R. 229, 237-238].  She was again told her prescription must last 30 days. *Id.*

The record contains an emergency room report dated September 3, 2005, indicating Plaintiff was treated for nausea, fever and chills possibly caused by a mild urinary tract infection.  [R. 151-155].  She was given Bactrim ( an antibiotic) and advised to call her primary care physician. *Id.*

On September 12, 2005, Plaintiff reported she had "horrible pain in her legs and she must take 5-6 Lortab to even remotely deal with pain." [R. 235].  She refused any increase of amitriptyline saying she "doesn't even take it now" and "won't take neurontin - only wants Lortab and lots of it." [R. 236].  Refill of Lortab was refused and Plaintiff was referred for pain management. She was reported to be hostile and rude to the staff

and medical student at the clinic. [R. 235-236].  On September 20, 2005, Plaintiff again requested Lortab refill and she also requested a "letter for SSI." [R. 233-234].  Both requests were denied. *Id.*

On September 27, 2005, Dr. O'Meara discussed Plaintiff's Lortab use with her. [R. 229-231].   Dr. O'Meara suspected Plaintiff had altered her August 29, 2005 prescription to read "one refill" before taking it to the pharmacy. *Id.*  Dr. O'Meara stated she did not wish to see Plaintiff again "as she failed to follow my advice, she abused the medication I gave her, she has exhibited abusive and disruptive behavior and we have very different views of treatment for her neuropathic pain - She wants narcotics and I would like her to be on meds known for neuropathy - namely neurontin/amitriptyline." *Id.*

Cornelia O. Mertz, D.O., wrote the following statement on October 5, 2005:

> Spoke [with] Ms. Wilson regarding her dismissal. Told the patient that because of a failure to follow advice and instruction and a failure to comply [with] medical directives the supervising staff felt that we at the health care clinic had reached the point of inability to appropriately treat the pt's medical conditions. The pt was told that the decision was based on a review of her entire chart. On numerous occasions the pt had refused to take the appropriate medication; additionally, she had abused her consumption of Narcotics and displayed a demanding attitude toward the staff on several occasions. The pt also was told that the possibility of prescription alteration was considered and it was the last reason that dismissal was ordered.
>   The pt was told that she could come to the HCC for a total of 14 days to receive care.  However, she must find another physician for services after the fourteenth day. The postmake (sic) on letter was 9-30-05 so she has until 10-13-05 to return to HCC.  Pt understood conversation. She will call the Oklahoma Health Care Authority to determine her new health care assignment.

8

[R. 228].

On October 21, 2005, Plaintiff called the OSU clinic for an appointment, stating Dr. Mertz told her she could come to the clinic after October 13, 2005. [R. 226].  She was instructed to go to the emergency room for further healthcare needs. *Id.*

Plaintiff was seen by James R. Campbell, D.O., on December 14, 2005. [R. 295-298].  In her health history, Plaintiff wrote she had damaged nerves in her feet and was currently taking neriotine [neurotin], lortab, prednisone and aillpertripline [amitriptyline]. [R. 295].  She reported hospitalization in 2005 for an ulcer, "3 holes in stomach" from taking too many Aleve or Tylenol because she was out of Lortab. [R. 297].[10]  She claimed she had problems with her physician at OSU Medical Clinic and had "requested to be seen by another physician." [R. 297].  Dr. Campbell diagnosed peripheral neuropathy and prescribed Cymbalta 30 mg. for the first week, increased to 60 mg. the second week. [R. 298].

On January 11, 2006, Plaintiff was seen by Dr. Campbell for follow-up. [R. 293-294].  Plaintiff complained of muscle pain in her calf and bilateral foot pain.  Dr. Campbell assessed hypertension, hyperlipidemia, history of sarcoidosis, peripheral neuropathy and history of gastric bleeding.  He prescribed Methadone 5 mg., and Lortab 7.5 mg. and added Benicar for high blood pressure. *Id.*  On February 9, 2006, Dr. Campbell authorized refill of Benicar and Methadone.[R. 291-292].  On March 2, 2006, Dr. Campbell refilled Methadone, Cymbalta and Lortab. [R. 289-290].  Dr. Campbell noted Plaintiff's history of opioid dependence on April 3, 2006, and instructed

---

[10]  There is no medical documentation of this event in the record.

that Lortab was to be taken up to twice per day. [R. 287-288].   On April 10, 2006, Plaintiff asked to talk to Dr. Campbell about her request four days earlier for a diagnosis of Diabetic Neuropathy "so Medicaid would pay for Cymbalta."  [R. 285-286].  Plaintiff stated she had told Dr. Campbell on her first visit that Neurontin "gives her the shakes." *Id.*  When the staff member suggested lab be drawn to check for Diabetes Mellitus, Plaintiff refused, saying she "has already been [checked] - don't have DM."  Plaintiff was given samples of Cymbalta and was advised that alternatives would be researched. *Id.*

Plaintiff saw Dr. Campbell on May 2, 2006. [R. 283-284].  She reported she had been having problems with depression over her peripheral neuropathic pain and that "the Cymbalta has helped mood and at same time has helped her peripheral neuropathy." [R. 283].  Methadone, Lortab and Cymbalta were refilled. [R. 284].  When Dr. Campbell saw Plaintiff on June 1, 2006 and June 29, 2006, refills of Methadone and Lortab were authorized and samples of Cymbalta were given. [R. 279-283].

Plaintiff commenced treatment at Sandy Park Clinic under the care of L. Janelle Whitt, D.O., on August 3, 2006. [R. 311-314].  She gave a history of neuropathy and complaints that her legs felt tight, "on fire" and that she had no balance or sensation. Plaintiff reported her current medications were Cymbalta 60 mg., Benicar 20 mg., Lortab 10 mg. three times a day and Methadone 5 mg. three times a day.  Plaintiff's difficulty with ambulation as well as distal muscle atrophy, diminished strength and positive subjective numbness in both lower extremities were noted. [R. 311]. Neuropathy and hypertension were assessed and Plaintiff's old records from OSU, Dr. Campbell and TRMC were requested. *Id.*

10

On August 19, 2006, a Sandy Park Clinic notation indicated Plaintiff "says she can't tolerate Neurontin or amitriptyline [because] of side [effects]." [R. 310].  Plaintiff was noted to have samples of Cymbalta. She was prescribed Methadone and a one time refill of Lortab with advice to use it sparingly and to wean off. *Id.*  Plaintiff agreed to pain management consult and to obtain narcotics and pain control from one provider. *Id.*  Plaintiff advised she did not check her blood pressure. *Id.*  She was assessed with hypertension and peripheral neuropathy.

On October 19, 2006, Plaintiff told a clinic physician's assistant that Lortab and Methadone were working well for pain but that she continued to experience numbness and tingling in the feet. [R. 309].  She admitted to not taking Benicar, her blood pressure medicine, and was instructed to take it when she got home. *Id.*  She became upset that she could not get pain medications at that appointment. *Id.*

On November 16, 2006, Plaintiff was seen by a nurse practitioner who spoke with Dr. Whitt by phone. [R. 308].  Refills of Lortab and Methadone were to be given the next day. [R. 308].  Pain Management was added to the assessment of hypertension and peripheral neuropathy. *Id.*

Dr. Whitt saw Plaintiff on December 8, 2006. [R. 307].  Plaintiff reported her pain was worse with colder weather and that she had to use more Lortab for breakthrough pain.  Dr. Whitt asked Plaintiff to obtain her old records from her prior treating physician and assessed "chronic pain."  The prescriptions for Methadone and Lortab were renewed. *Id.*

On January 8, 2007, Dr. Whitt saw Plaintiff for vaginal bleeding but decided to wait on the TRMC records of Plaintiff's hysterectomy before assessing a treatment plan.

11

[R. 306].  Plaintiff's Methadone and Lortab prescriptions were refilled. *Id.*  On January 25, 2007, Dr. Whitt  conducted a vaginal exam and prescribed an antibiotic. [R. 305].

Plaintiff was next seen at Sandy Park Clinic on March 12, 2007, by an unidentified person and given a two week supply of Lortab with instructions to get medications only from her primary care physician, to wean off Lortab and titrate up Methadone and other medications. [R. 304].  Chronic pain was assessed.

Dr. Whitt saw Plaintiff on March 15, 2007, and noted: "Feet feel like 'on fire, itching, burning' no symptoms prior to epidural" "Methadone seems to hold better if 1/2 am 1/4 afternoon and 1/4" "Hasn't seen pain mgmt since starting w/ us. Cymbalta was working but Mcd won't auth." [R. 303].  Her assessment was chronic pain and Plaintiff was referred to pain management.  Methadone, Benicar, Lortab and Cymbalta were given. *Id.*

On May 3, 2007, Plaintiff complained to the nurse at Sandy Park Clinic of increased blood pressure and stated she had been taking extra doses of Benicar when she felt her blood pressure go up. [R. 302].  The nurse reported Plaintiff was "trying to take extra dose in exam room." *Id.*  Plaintiff left before the appointment was finished. She was assessed with hypertension and chronic pain.

Dr. Whitt saw Plaintiff on May 14, 2007, and noted Plaintiff had no headaches since the dosage of Benicar was increased. [R. 301].  Plaintiff complained of neuropathy in her feet and reported Neurontin in the past had caused trembling and shaking. *Id.* Dr. Whitt wrote: "depressed mood [due to] medical [diagnosis] on Elavil in past caused extreme fatigue."  *Id.*  Under assessment and plan, she wrote: 1)

depression; 2) HTN; and 3) chronic pain. *Id.*  Plaintiff was given Cymbalta, HCT2 and Methadone and was told to decrease salt and discontinue NSAIDS (Aleve). *Id.*

On June 7, 2007, Dr. Whitt wrote: "BP better" "Ready to Quit Smoking" "Not having dizziness" "Slept well on Ambien CR." [R. 300].  She assessed: 1) HTN; and 2) chronic pain. *Id.*  Plaintiff was to hold the HCT2 but to continue her other medications of Methadone and Ambien CR. *Id.*

At the hearing held before the ALJ on August 9, 2007, Plaintiff produced a letter from Dr. Whitt, dated July 27, 2007, which reads as follows:

> To Whom It May Concern:
>   We have been seeing Ms. Wilson since 8-3-06.  She has primarily been treated for peripheral neuropathy with chronic pain, hypertension, and depression.
>   She is now taking Methadone 40 mg. Cymbalta 60 mg. Benicar 40 mg. and Lopid 600 mg.
>   If you need anymore information, do not hesitate to contact my office.

[R. 315].

After the hearing, Plaintiff sent the agency the following letter from Dr. Whitt, dated  August 13, 2007:

> To Whom It May Concern:
>   Ms. Wilson has been a patient of OU-Bedlam at Sandy Park since August 2006.
>   Her diagnoses include peripheral neuropathy with chronic pain, hypertension, depression, hyperlipidemia, sarcoidoses and a history of a perforated ulcer and hysterectomy.  Her medications include Methadone and Lortab for pain, Benicar for hypertension, Lopid for high cholesterol and Cymbalta for depression and chronic pain.

[R. 316] (closing paragraph with contact information omitted).

## **Mental Impairment**

13

The ALJ determined Plaintiff had physical impairments that were severe at step two. [R. 14].  With regard to Plaintiff's alleged depression, the ALJ said:

> The claimant received a prescription on March 2, 2006 for Cymbalta.  The clinical notes do not indicate the reason. Clinical notes of May 2, 2006 state "problems with depression".  The next clinical note regarding her depression was May 14, 2007 which stated the claimant was on Elevil and was now placed on Cymbalta.  The claimant has not sought treatment from a mental health professional for this condition and there are very few complaints of this condition to the health care profession.  The [ALJ] finds that the claimant's depression does not prevent her from substantial gainful activity.

[R. 14].

Plaintiff asserts that, in addition to her physical impairments, she has a mental impairment of depression.[11]  She claims the ALJ failed to apply the proper analysis to determine the severity of her depression.[12]  Defendant responds that Plaintiff failed to demonstrate the existence of a medically determinable mental impairment which would require application of the "special technique."  The Court agrees with Defendant.

The burden to prove disability in a Social Security case is on the claimant and to meet this burden, the claimant must furnish medical and other evidence of the

---

[11]  In her applications materials, Plaintiff complained of instability, balance problems, pain and numbness in her feet related to "nerve damage" and inability to stay awake because of medications. [R. 42, 45, 73, 74, 76, 78, 98, 103, 106, 110, 113, 115, 118]. No claim based upon a mental impairment was asserted by or on behalf of Plaintiff in describing her impairments before the hearing. *Id.*

[12]  Under the regulations, when evaluating mental impairments, the agency must follow a "special technique." 20 C.F.R. §§ 404.1520a(a), 416.920a(a). The degree of functional loss resulting from the impairment must be rated in four areas: (1) activities of daily living, (2) social functioning, (3) concentration, persistence or pace; and (4) deterioration or decompensation in work or work-like settings. 20 C.F.R. §1520a(b)(3). The pertinent findings and conclusions required in the application of the technique supported by a narrative rationale, are required in the body of the decision. 20 C.F.R. § 404.1520a. "The decision must include a specific finding as to the degree of limitation in each of [those] functional areas." Id. §§ 404.1520a(e)(2), 416.920a(e)(2).

existence of the disability. *See Bowen v. Yuckert*, 482 U.S. 137, 146 & n.5, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (Step two of the five-step review process "determines whether the claimant has a medically severe impairment or combination of impairments."). A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings. 20 C.F.R. § 416.908. After the existence of a medically determinable mental impairment has been established, the special technique is employed. 20 C.F.R. § 416.920a (evaluation of mental impairments).

The medical record in this case shows that in December 2004, Plaintiff received Elavil (amitriptyline), an antidepressant that is also sometimes used to treat post-herpetic neuralgia (the burning, stabbing pains, or aches that may last for months or years after a shingles infection) in conjunction with Neurontin, also prescribed for treatment of neuralgia.[13]   When those medications were prescribed starting in 2004 and continuing through 2005, at which time Plaintiff refused to take either medication, there were no complaints by Plaintiff and no diagnosis by medical care providers of depression.  Likewise, when Plaintiff was first given Cymbalta on April 21, 2005, there was no suggestion anywhere in the treatment records that Plaintiff was depressed.

The first mention of depression by Plaintiff's medical care providers appears in Dr. Campbell's May 2, 2006, treatment notes that Plaintiff was having problems with depression over her pain and that Cymbalta helped her mood while helping the

---

[13]  *See* Drugs & Supplements information online at: http://www.nlm.nih.gov/medlineplus/drug info/meds/a682388.html (last revised 08/01/2007 - last reviewed 09/01/2008); /a694007.html (last revised 06/01/2008 - last reviewed 09/01/2008).

peripheral neuropathy. [R. 284].  By that time, Plaintiff had already been taking Cymbalta for over a year for treatment of her neuropathy related symptoms.  No diagnosis of depression was ever assessed by Dr. Campbell.

The diagnosis of depression appeared once in Dr. Whitt's treatment notes. Again, the diagnosis came long after Cymbalta had been prescribed for treatment of neuropathy.  There was no indication in those treatment records that Cymbalta or any other psychotropic medication was prescribed for treatment of depression. The diagnosis was dropped from Dr. Whitt's subsequent treatment notes and did not reappear until Dr. Whitt's letters which were written just before and shortly after the hearing before the ALJ.  The diagnosis was not accompanied by a rationale or any objective medical findings; nor was it supported by medically acceptable clinical and laboratory diagnostic techniques.  A passing reference and one-time diagnosis is not sufficient to establish the existence of a severe impairment. *See Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) (The mere diagnosis of an impairment or condition is not sufficient to sustain a finding of disability.). It is clear from the record that the antidepressants were prescribed as treatment for Plaintiff's neuropathic symptoms. That Plaintiff's mood improved with the medication was an additional benefit of taking the medication as Dr. Campbell's comment clearly demonstrates. It was not until Dr. Whitt wrote a follow-up letter after the hearing, that Cymbalta was tied to treatment of depression.  Nowhere in the medical record is there a clinical finding of functional limitations caused by a mental impairment.  Nor are there any suggestions by any of Plaintiff's medical care providers that Plaintiff complained of a mental impairment that impacts her ability to perform work activities.

Plaintiff's own testimony reflects her understanding that amitriptyline was prescribed for her peripheral neuropathy and that Cymbalta was prescribed as a substitute for Neurontin. [R. 337, 350].  Furthermore, in a letter to the agency after the hearing, Plaintiff stated outright that she was not depressed when she was prescribed Cymbalta. [R. 318].

The ALJ acknowledged the medical evidence indicating Plaintiff had been prescribed Elavil and Cymbalta. [R. 14].  He also noted the statements by Dr. Campbell and Dr. Whitt in their treatment records regarding Plaintiff's reported "depressed mood." *Id.*  Although he could have more aptly stated that the record does not support Plaintiff's claims of severe depression, his ultimate determination at step two that Plaintiff's severe impairments did not include a mental impairment is not contradicted by the medical record. *See Allen v. Barnhart*, 357 F.3d 1140, 1145 (10th Cir. 2004) (harmless error analysis may be appropriate to supply missing dispositive finding where, based on material ALJ considered, no reasonable administrative factfinder could have resolved the factual matter in any other way); *see also Wall v. Astrue*, --- F.3d ---, 2009 WL 522867 (10th Cir. March 3, 2009) quoting *Williamson v. Barnhart*, 350 F.3d 1097, 1100 (10th Cir. 2003) (a "mental impairment must be of a nature and degree of severity sufficient to justify its consideration as the cause of failure to obtain any substantial gainful work.").  The Court finds no error was committed by the ALJ in declining to find a mental impairment at step two and in not applying the "special technique" which is required only after a medically determinable mental impairment is established by medical evidence.

### RFC and Hypothetical

Plaintiff's complaint that the ALJ erred by not including an accommodation for Plaintiff's depression in the RFC or in the hypothetical to the VE at the hearing is unavailing.  Hypothetical questions need only reflect impairments and limitations that are borne out by the evidentiary record. *Decker v. Chater,* 86 F.3d 953, 955 (10th Cir.1996).  Because the evidentiary record in this case did not establish that any functional limitations were imposed by a mental impairment, there was no requirement that the RFC contain such an accommodation.

With regard to Plaintiff's contention that the ALJ had no medical basis for his assessment of Plaintiff's RFC, there is no requirement that an ALJ point to "specific, affirmative, medical evidence on the record as to each requirement of an exertional work level before [he] can determine RFC within that category." *Howard v. Barnhart*, 379 F.3d 945, 949 (10th Cir.2004).  The determination of RFC is an administrative assessment, based upon all of the evidence of how the claimant's impairments and related symptoms affect her ability to perform work related activities. See Soc. Sec. Rul. 96-5p, 1996 WL 374183, at *2, *5. The final responsibility for determining RFC rests with the Commissioner, and because the assessment is made based upon all of the evidence in the record, not only the relevant medical evidence, it is well within the province of the ALJ. See 20 C.F.R. §§ 404.1527(e)(2); 404.1546; 404.1545; 416.946.

Contrary to Plaintiff's contention, there is not "a total lack of evidence about what a claimant can do" in this case. [Plaintiff's Reply, Dkt. 22, p. 3].  Dr. Lee found no physical limitations other than slightly diminished flexion of the knees. [R. 140-145]. Plaintiff's muscle strength and function of the hands was normal and she was able to manipulate small objects and handle tools with either hand. *Id.* Plaintiff testified she has

18

no problem sitting and that she could do office work except that she fell asleep. [R. 342, 348].  The ALJ thoroughly and properly considered the evidence in the record, including the medical evidence, and determined that Plaintiff has the RFC to lift, carry push or pull 10 pounds occasionally and less than 10 pounds frequently; stand or walk 2 hours in an 8-hour workday; and sit 6 hours in an 8-hour workday. [R. 15].  Plaintiff does not identify any physical limitations that were improperly excluded from the RFC.  She does not now, nor did she at the hearing, describe what impact hypertension had upon her ability to perform work activities that was not properly considered by the ALJ. *See Hawkins v. Chater*, 113 F.3d 1162, 1168 (10th Cir. 1997) (ALJs not required to "exhaust every possible line of inquiry in an attempt to pursue every potential line of question. The standard is one of reasonable good judgment); *Branum v. Barnhart*, 385 F.3d 1268, 1271 (10th Cir. 2004) (ALJ is generally entitled to rely on counsel to structure and present claimant's case in a way that the claims are adequately explored.). The Court finds the ALJ's RFC findings are based upon and are supported by substantial evidence in the record.

Plaintiff contends the ALJ's hypothetical to the VE at the hearing was improper because he "neglected to state with specificity what the particular periods of sitting, standing and walking were." [Dkt. 16, p. 4].  The VE identified the exertional and SVP requirements of Plaintiff's past relevant work (PRW) as those jobs are normally performed and as Plaintiff described them. [R. 352].  He testified that Plaintiff's past work in telemarketing is normally considered sedentary. *Id.*  The ALJ asked the VE in his first hypothetical  to assume an individual could perform a full range of light and sedentary  work and asked if he needed to go over the lifting, carrying, sitting, standing

and walking elements. [R. 352-353].  The VE responded that he was familiar with them. *Id.*  In the follow-up second hypothetical, the VE testified that the light jobs Plaintiff had performed in the past required balancing and walking.  He described the telemarketer job as "about as easy physically a job in the economy that there would be."  [R. 355-356].  After reviewing all the evidence in the record, including the medical evidence, Plaintiff's testimony and the VE's testimony, the ALJ found Plaintiff is unable to perform her past light and medium work [because] she is now reduced to sedentary work. [R. 18].[14]  Plaintiff has pointed to no evidence in the record that the ALJ failed to consider or that he improperly considered in determining Plaintiff is able to perform the functional demands of sedentary work.  After review of the record as a whole, the Court finds the ALJ's RFC assessment and his conclusion that Plaintiff can perform the full range of sedentary work, including her past work as a telemarketer, are supported by substantial evidence.

### The Listings

Plaintiff contends the ALJ failed to perform a proper step three evaluation because he did not discuss the evidence or even name a single listing he had considered and rejected.  It is true that the ALJ did not specifically identify Listing 11.14, which Plaintiff asserts she meets or equals.  However, he did discuss the evidence,

---

[14]  The ability to perform the full range of sedentary work requires the ability to lift no more than 10 pounds at a time and occasionally to lift or carry articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. "Occasionally" means occurring from very little up to one-third of the time, and would generally total no more than about 2 hours of an 8-hour workday. Sitting would generally total about 6 hours of an 8-hour workday. SSR 96-9p, 1996 WL 374185

including the medical documentation of Plaintiff's peripheral neuropathy.  And, as pointed out by counsel for the Commissioner, the ALJ obviously considered the listing at step three, stating:

> The claimant's peripheral neuropathy has not been shown to cause disorganization of motor function such as significant and persistent disorganization of motor function in at least two extremities, resulting in sustained disturbances of gross and dexterous movements, or gait and station in spite of prescribed treatment.  The Administrative Law Judge finds that this impairment does not meet a listed impairment.

[R. 15].

"At step three, the ALJ determines whether the claimant's impairment is equivalent to one of a number of listed impairments that the [Commissioner] acknowledges as so severe as to preclude substantial gainful activity." *Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir.1996) (citation and internal quotation marks omitted). Plaintiff has the "step three burden to present evidence establishing her impairments meet or equal listed impairments." *Fischer-Ross*, 431 F.3d at 733. To satisfy this burden, Plaintiff must establish that her impairment "meet[s] all of the specified medical criteria. An impairment that manifests only some ... criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990).  In addition, the determination of whether Plaintiff's impairment meets or equals the listing must be based solely on medical findings. *See Bernal*, 851 F.2d at 300; 20 C.F.R. § 416.926(b) (stating that the Commissioner "will always base [the] decision about whether [a claimant's] impairment[ ] is medically equal to a listed impairment on medical evidence only").

Relying on *Clifton*, Plaintiff argues that the ALJ did not consider Listing 11.14 or discuss the evidence he considered in determining Plaintiff did not meet the listing. Unlike in *Clifton*, this case does not involve "a bare conclusion [that] is beyond meaningful judicial review." *Clifton*, 79 F.3d at 1009.   In his decision, the ALJ set forth a specific step-three finding and he addressed the medical criteria that is set forth in the listing.  He summarized Plaintiff's medical treatment record in some detail, noting in particular her symptoms relating to peripheral neuropathy.  The Court has determined that the ALJ's RFC determination is supported by the evidence, including Plaintiff's admission that she is able to perform office work.  Because the ALJ's findings at subsequent steps are supported by substantial evidence in the record, there is a proper basis for upholding the ALJ's conclusion that Plaintiff's impairments do not meet or equal any listed impairment. *Fischer-Ross*, 431 F.3d at 733 (holding that administrative findings and supporting factual analysis at steps four and five conclusively demonstrated that challenged summary conclusion at step three was properly supported by factual analysis, and "[n]o reasonable factfinder could conclude otherwise").  Under the circumstances presented in this case, the Court finds  the ALJ's failure to identify Listing 11.14 does not require reversal.

### Credibility Determination

Plaintiff raises a number of challenges to the ALJ's determination of her credibility. The ALJ is "the individual optimally positioned to observe and assess witness credibility." *Casias v. Sec'y of Health & Human Servs.*, 933 F.2d 799, 801 (10th Cir. 1991).  "Credibility determinations are peculiarly the province of the finder of fact, and [the court] will not upset such determinations when supported by substantial evidence." *Kepler v. Chater*, 68 F.3d

387, 391 (10th Cir.1995) (quotation omitted). "It is well-established that an ALJ's findings with respect to a claimant's credibility should be closely and affirmatively linked to substantial evidence and not just a conclusion in the guise of findings." *Hardman*, 362 F.3d at 678-79 (quotation omitted).

Here, the ALJ explained his reasons for concluding Plaintiff's testimony and statements were not fully credible, including inconsistencies with the medical evidence and her willingness to misrepresent her earnings and work activities after her alleged onset date. [R. 18].[15]  These are proper factors for the ALJ to consider in determining whether Plaintiff's allegations of inability to work are credible.  *See Decker v. Chater*, 86 F.3d 953, 955 (10th Cir. 1996) (Among the reasons for discounting allegations of total disability were the medical and clinical findings that were inconsistent with the claimant's allegations.); *Kepler*, 68 F.3d at 391; *Hamilton v. Sec'y of Health & Human Servs.*, 961 F.2d 1495, 1499 (10th Cir. 1992).   Plaintiff offers some explanations for her abuse of Lortab and dismissal from the OSU clinic as a consequence of her refusal to follow recommended treatment and her behavior toward medical personnel. [Dkt. 16].  She is essentially inviting the Court to reweigh the evidence.  This it cannot do. *Hamlin v. Barnhart*, 365 F.3d 1208 (10th Cir. 2004) (court "may neither reweigh the evidence nor substitute [its] discretion for that of the [Commissioner].").

Contrary to Plaintiff's argument, the ALJ did not ignore evidence regarding Plaintiff's neuropathic symptoms.  Based upon his review of the evidence and after weighing Plaintiff's credibility, he determined Plaintiff does have limitations caused by peripheral

---

[15]  In her post-hearing letter to the agency, Plaintiff admitted that she "did lie about things." [R. 319].

23

neuropathy and assessed an RFC for sedentary work activities due to those limitations. Because the ALJ identified specific and legitimate reasons for doubting claimant's statements that she is unable to engage in any gainful activity and because the ALJ's credibility findings are closely and affirmatively linked to substantial evidence, it is not the Court's prerogative to disturb it. *Qualls v. Apfel*, 206 F.3d 1368, 1372 (10th Cir. 2000).

## <u>Conclusion</u>

The record as a whole contains substantial evidence to support the determination of the ALJ that Plaintiff is not disabled.  Accordingly, the decision of the Commissioner finding Plaintiff not disabled is AFFIRMED.

SO ORDERED this 20th day of April, 2009.


FRANK H. McCARTHY
UNITED STATES MAGISTRATE JUDGE